OPINION OF THE COURT
William P. Polito, J.
Relief Requested
Plaintiff on December 2, 2009 moved to quash the defendant’s November 10, 2009 motion for a court-issued subpoena duces tecum to compel the sheriffs property clerk to turn over two vials of whole blood from its storage room for blood alcohol testing.
Facts
Approximately, two years earlier on January 29, 2008 at 4:00 p.m. the blood had been drawn from the plaintiff at the hospital following a construction accident the same day at 3:00 p.m. The plaintiff had fallen 20 feet onto his face and head from an elevated plank or area, suffering injuries for which he seeks recovery in this lawsuit commenced on June 11, 2008. The subject samples, although requested by the investigating sheriffs deputy and administered by a nurse, were never tested at that time because the lab determined it had no authority to test the blood. The sealed unvacuumed blood vials were then placed and kept in a sealed cardboard box on a storage room shelf at room temperature, presumably, between 60 to 70 degrees Fahrenheit. On or about January 5, 2010 the attorneys agreed to have the vials placed into a refrigerated state.
Issue
Whether the present testing of the two-year-old blood samples stored in unvacuumed vials at room temperature will show authentic results of the existence and level of the blood alcohol concentration (BAG) at the time the sample was taken, viz., the existence of alcohol and at a higher level than that shown in the sample solely from the plaintiffs consumption.
Decision
The plaintiffs motion to quash is granted, and the defendant’s request to allow testing of the two-year-old unrefrigerated and unvacuumed whole blood samples is denied as such testing will not produce any authentic or reliable results of the existence of, or the level of blood alcohol concentration at the time the samples were taken.
*274 Parties’ Contentions
The parties’ experts disagree on whether forensic science is capable of arriving at such conclusions with the necessary-degree of forensic certainty. Since the submissions were sufficient to raise the issue, a Frye hearing was scheduled and heard on January 26, 2010. (People v Karpeles, 146 Misc 2d 53 [Crim Ct, Richmond County 1989] [authenticity of seven-year-old refrigerated sample].)
Burden of Proof
The defendant proponent has the burden of proof to establish that the theory and method used by his expert is generally accepted in the forensic community and his conclusions are more than mere speculation. (Romano v Stanley, 90 NY2d 444, 451-452 [1997].)
Frye Hearing
Alcohol Loss (Evaporation and Oxidation)
Both parties and their experts agree that blood samples taken two years earlier can be tested to accurately measure the amount of blood alcohol contained therein at the time of testing. Both parties and their experts further agree that such results cannot be reliably related back to the blood alcohol level at the time the sample was taken, or, consequently, to the time of the accident. The reason is that over time, whole blood samples kept at room temperatures at or above 62 degrees Fahrenheit for long periods of time, as here, will dissipate the alcohol contained therein, if any, by evaporation and oxidation. The oxidation process occurs as a result of invading or already present microorganisms. Their rate of activity in oxidizing the alcohol is variable depending greatly on air, time and temperature. Tests have shown no relationship of a constant rate of oxidation in long-term samples with the original level of alcohol in that sample, so as to be able to relate the blood alcohol level at the time of the sample test back to the time that the sample was taken with any degree of reliability. Although the proper taking of the sample with a nonalcoholic swab, a clean needle, the addition of the preservative sodium fluoride, and refrigeration will not stop or eliminate the oxidizing activity, it will sufficiently slow or reduce that microorganism activity so that testing after short periods of refrigerated storage can be used to reliably and authentically relate it back to the blood alcohol level at the time the sample was taken and, consequently, at the time of the accident. Numerous tests have confirmed this to the extent it is generally accepted in the forensic community, and, as aforesaid is not disputed or at issue here.
*275 Further the testing of properly drawn long-term samples has shown by repeated testing that such relation back is not reliable for long-term periods of whole blood storage at 62 degrees Fahrenheit or higher, as here, and such unreliability is generally accepted in the forensic community. The experts here are not in dispute. There is no known method or test by which the results can be reliably extrapolated back to the time the samples were taken.
Alcohol Creation
There is another change which takes place over time in the blood samples. The plaintiff asserts and the defendant agrees that the microorganisms which invade a blood sample over that two-year period of time, despite proper protocol in taking the sample, can create alcohol in the sample, even where there was none at the time the sample was taken. Both also agree that where such alcohol is found in the sample after two years, it is impossible to determine by any known testing methods whether the source was originally there, or was subsequently created by microorganisms. In other words, the intervening alcohol created by microorganisms is no different than, and is indistinguishable from, alcohol originally consumed, if any.
Significantly, here, both also agree that there is no observation or test known by which one can distinguish between those samples which were invaded initially or later by alcohol-causing microorganisms, and those which were and remained solely consumption caused.
Experts’ Disagreement
Defendant’s Expert
However, the defendant’s expert asserts, as to any alcohol found in the subject samples when tested, while it may “possibly” have been caused by intervening alcohol-causing microorganisms, that as an expert, he can opine that these long-term samples were “probably” not invaded with the alcohol-causing microorganisms, which cause additional or increased alcohol readings, but were the sole result of alcohol consumption, and, if found, at a higher amount of consumption than needed to reach the BAG shown in the tests. (R. Osiewicz, direct examination, Jan. 26, 2010, at 14, line 20, at 15, line 3 also at 13, lines 18-23, at 21, line 23, at 22, line 4.)
His opinion is based on the theory that when proper protocol is used in taking the samples, then any alcohol shown is probably caused only by the person’s consumption of alcohol, but at *276 higher BAG than the levels shown because of the intervening alcohol loss by evaporation and/or oxidation by microorganisms. (R. Osiewicz, direct examination, Jan. 26, 2010, at 13, line 24, at 14, line 19.)
Plaintiffs Expert
Contrary thereto, the plaintiffs expert asserts that, even when proper protocol is used in taking the samples, there is no known method and accepted method by which anyone can determine which long-term samples were invaded by alcohol-producing microorganisms and which were not. He states that the precautions in taking the sample, such as the initial swab, and the preservative sodium fluoride, only delay the onset of the microorganisms’ effect on the blood condition for relatively short periods for unrefrigerated samples, and that even immediate and continued refrigeration does not stop the process of loss of alcohol, or the creation of alcohol, but merely slows down that continued process. (R. Greendyke, direct examination, Jan. 16, 2010, at 53, lines 19-25.)
Rationale
The defendant’s expert is concededly not relying on any known scientific tests or principles to support the results which he claims will be derived from the test. He acknowledges that he has never had a similar case in his many years of experience, that he could only find one test in 1983, which, the plaintiffs expert shows, is equivocal, and has not been cited thereafter. A 1983 article in the same year infers there is not yet any such reliable testing of such samples which is generally acceptable to the forensic community. The authors, after testing for deterioration of blood samples after 14 days, noted:
“the increases [were attributed] to postmortem synthesis of ethanol by microbial fermentation of glucose.
“If there were such variations in alcohol content in stored blood sampled from inebriated living human beings, it would present a serious forensic implication: blood samples taken from living human subjects for the legal testing of sobriety would need to be evaluated immediately; otherwise, a legal defense could challenge the validity of the results.” (Charles L. Winek and Louette J. Paul, Effect of Short-Term Storage Conditions on Alcohol Concentrations in Blood from Living Human Subjects, 29 Clinical Chemistry [No. 11] 1959, 1960 [1983].)
*277 Further, in the 1996 article submitted by the defendant, written 13 years after the defendant’s sole test article on short-term storage, the authors state: “There is a paucity of data available on the effect of storage on blood alcohol concentration (BAG) at elevated temperatures.” (Tracey Winek, Charles L. Winek and Wagdy W. Wahba, The effect of storage at various temperatures on blood alcohol concentration, 78 Forensic Science Int’l [issue 3] 179 [1996].)
Rather, the defendant’s expert is theorizing on the scientific principles that alcohol loss always occurs over time even under proper protocol, but that such protocol will “probably” prevent all alcohol-causing bacteria in such a statistically meaningful number of times as to allow an opinion that the results are probably attributed to the person’s original consumption of alcohol. However, again no such statistical information has been provided, or shown to be so tested, or proof provided that it is a generally accepted principle in the forensic community, and, as such, the expert’s opinion would only constitute speculation.
“[W]here the expert states his conclusion unencumbered by any trace of facts or data, [the] testimony should be given no probative force whatsoever . . . “Moreover, plaintiffs’ expert’s affidavit was devoid of any reference to a foundational scientific basis for its conclusions. No reference was made either to [the expert’s] own personal knowledge acquired through his practice or to studies or to other literature that might have provided the technical support for the opinion he expressed.” (Romano, 90 NY2d at 451-452 [citation and internal quotation marks omitted].)
The defendant herein has failed to show that its expert’s theory was generally accepted, or that his “probability” opinion had a significantly sufficient basis to constitute the level of non-speculative assurance required by the standard of “a reasonable degree of forensic or scientific certainty,” although those exact words are not required to be recited.
Accordingly, the defendant has not met its burden of proof that the results of a current test of the samples have any authenticity or reliability to accurately show the blood alcohol concentration at the time the test was taken two years before.